UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EDGARDO J. MERCADO-RAMOS,[1]

                             Petitioner,            DECISION AND ORDER

-vs-

                                           19-CV-6769 (CJS)

JOSEPH H. NOETH, *Superintendent,*
*Attica Correctional Facility*

                             Respondent.

_____

## I. INTRODUCTION

This matter is before the Court on Petitioner Edgardo Mercado-Ramos's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he challenges his conviction in New York Supreme Court, Erie County on one count of burglary, one count of criminal possession of a weapon, and one count of criminal contempt. Pet., Oct. 17, 2019, ECF No. 1. For the reasons set forth below, Petitioner's application [ECF No. 1] is denied.

## II. BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. In February 2015, Petitioner was charged by way of a grand jury indictment in the New York Supreme Court in Erie County with one count of burglary in the first degree, one count of criminal possession of a weapon in the third degree, and one count of criminal contempt in the first degree. Indict. No. 00021-2015, Feb. 20, 2015. The burglary and criminal possession of a weapon charges were based on accusations that late on December 25 and into the early hours

_____

[1] Due to a difficulty deciphering Petitioner's handwriting in his original petition, the caption in the Court's CM/ECF electronic filing system refers to Petitioner as "Edgurdo." The Clerk of Court is directed to fix the caption to read "Edgardo."

of December 26, 2014, Petitioner unlawfully entered the dwelling of the victim, his former girlfriend, with the intent to commit a crime therein, and threatened her with a machete. The criminal contempt charge was based on the accusation that his entrance into the victim's home with the intent to harass, annoy, threaten or alarm her was in violation of a protection order issued against him in August of that year by the City Court of Buffalo.

A jury trial was held in September 2015. Trial Transcript ("Tr."), Sept. 14–23, 2015. At trial, the jury heard testimony from seven witnesses for the prosecution, and no witnesses for the defense. Most significantly, the victim testified that she and Petitioner dated between December 2012 and July 2014, and that for most of that time they lived together. Tr. at 602. After their relationship ended, she did not see Petitioner until he showed up at her house on December 24, 2014, punched her, kicked her, and stole between 20 and 50 Xanax pills from her. Tr. 610–11, 660. The victim testified that Petitioner was "acting crazy" when he first arrived on the 24th, but that after he ingested some of her Xanax pills he was "a whole different type of crazy," slurring words and punching her in the face without warning. Tr. at 662. She said that after Petitioner left that evening, she cried herself to sleep on the couch. Tr. at 610–11.

The victim also recounted the next day, December 25, when Petitioner texted her throughout the day and she repeatedly responded that he could not come over. *See, e.g.,* Tr. at 663. Nevertheless, despite her texts that he could not come over, Petitioner arrived at the victim's house after dark and knocked on the window. Tr. at 612. When she refused to let him in, Petitioner forced his way through a living room window. Tr. at 612–13. The victim testified that she then attempted to run out the kitchen door, but Petitioner grabbed her from behind and emptied a can of mace in her face. Tr. at 616. The victim further testified that for the next few hours, Petitioner variously beat her, choked her to the point of losing control of her bladder, threatened her with a machete he brought with him, and smashed her children's Christmas

presents with the machete. Tr. 617–19. She stated that Petitioner smelled like alcohol, and she could tell that he had ingested more of the pills he had taken from her because he "wasn't really making complete sense." Tr. 677. She believes that eventually he figured out the police were coming and ran out the door. Tr. at 623.

The victim's friend, Daniel Galvin, corroborated the victim's account by detailing text message exchanges with the victim during Christmas day. He indicated that he had received a text message from the victim around 6 p.m. on Christmas day that read: "Danny, my ex, got out of jail and came here last night and robbed all of my money and medication and beat the f[***] out of me, I just woke up, I don't know what the f[***] to do." Tr. at 562. Because Galvin was at dinner with his family, he did not see the message until later that evening, at which point he responded by text, asking at 11:10 p.m. whether she was safe. Tr. 564. She responded with a one word text: "Not." Tr. 565. Galvin then called the police and tried to direct them to the victim's home, but he couldn't remember her exact address. Tr. 566. He texted the victim again, and she responded with a second distressed message: "Help. Hurry." Tr. 566.

Finally, "sometime around midnight," Galvin drove to what he knew to be the victim's home so that he could give police an accurate address. Tr. 552. Within minutes of his arrival at the victim's home, Galvin saw Petitioner walking down the driveway away from the victim's house and then up the street. Tr. 552. He called police back to give a description of Petitioner and what he was wearing, and showed the first police officer on the scene the direction Petitioner had walked up the street. Tr. 553. Galvin testified that he approached the victim's home, and found the storm door completely off its hinges (Tr. at 554); the front door wide open (Tr. at 554); the victim hyper-ventilating, crying, "battered" and red (Tr. at 554); a machete on the floor in the kitchen (Tr. at 554); a room divider broken in half (Tr. at 555); and a mobile device / tablet smashed into pieces (Tr. at 555). He also stated that when he hugged the victim, he started

3

getting a sensation of hot pepper in his mouth that spread all over his face. Tr. at 556.

The victim's neighbor, Brian Spellburg, also testified. Tr. at 703. Spellburg did not know the victim well, but he had spoken with her on occasion and recognized Petitioner from the time that Petitioner and victim were living together. Tr. at 704. He stated that when he arrived home that evening from a family event, he heard the victim screaming, and proceeded down her driveway toward the victim's house. Tr. at 706–07. When he got closer to the house, he saw Petitioner choking the victim with one hand. Tr. at 707. However, because he saw police arriving on the scene, Spellburg retreated to his home and let the police handle the matter. Tr. at 707.

In addition to civilian witnesses, the jury also heard testimony from several police officers. Officer Jason Schnelle was one of the first officers on the scene. He testified that he was directed to the victim's home by Galvin, and entered the front door to find a large mess in the kitchen, including a long, black machete on the floor, garbage strewn all over, and tables broken in half. Tr. at 499. He stated that the victim's clothes were "messed up as if they were being pulled on. She had bruising on her face. She was in extreme distress. She was crying, very upset." Tr. at 500. In addition, he stated that the victim had reported to him that she had been assaulted by her ex-boyfriend. Tr. at 501.

Officer Patrick Boice was also one of the first officers on the scene, except he stayed in his vehicle to pursue the Petitioner rather than enter the victim's home. Tr. at 716. Officer Boice testified that he apprehended Petitioner on the sidewalk less than a block from the victim's home, and recovered a can of mace from his person. Tr. at 716. He stated that Petitioner was acting strange and silent when he was first apprehended, and was unresponsive to questions. Tr. at 735–36. However, he also noted that Petitioner complied with instructions to get into the police vehicle, and that he did not struggle with the officers when it came time for them to put him in handcuffs. Tr. at 720, 723–24. Once at the station house and central booking, Petitioner was

4

compliant during the fingerprinting and search process, and was not stumbling or falling over. Tr. at 728.

Lieutenant Jon Kokotajlo was also on the scene that night. After entering the victim's home, he detected the scent of mace, and saw that the victim's eyes were red and slightly puffy, and that her nose was running. Tr. at 784. In addition to observing the victim at her home, Lieutenant Kokotajlo had the opportunity to observe Petitioner after he was transported to the station house. Based on his extensive training on intoxication from the Erie County Training Academy, Lieutenant Kokotajlo stated that he believed Petitioner "was under the influence of a substance," but he did not believe that Petitioner "was too heavily intoxicated to be aware of what was going on." Tr. at 796. He based this opinion on his observations that Petitioner had glassy eyes, but had no slurred speech, responded appropriately to questions, and "walked just fine." Tr. at 791–94.

Although the defense did not present any witnesses, Petitioner's trial counsel did vigorously cross-examine the prosecution's witnesses, and attempted to establish a defense of intoxication. For instance, during his opening statement, defense counsel stated that he believed the prosecution would be unable to present evidence to prove that Petitioner had sufficient intent to commit the crimes with which he was charged. Tr. at 492. In addition, during his cross-examination of the victim, counsel elicited testimony that indicated she was on "a pretty high dose" of Xanax, and that Petitioner had stolen and ingested multiple of her pills. Tr. at 660. He also noted that the victim had commented in one of her text messages to Petitioner on December 25 that he was still "f'd up" by the drugs he had stolen from her. Tr. at 663. The victim stated on cross that after he entered her home, Petitioner smelled like alcohol and "wasn't really making complete sense." Tr. at 677.

Counsel also elicited testimony from the police officer witnesses that Petitioner was

"zoned out" and "staring off" during preliminary questioning (Tr. at 735–36), and that he was "a little off" when being read his Miranda rights (Tr. at 747). Accordingly, at the close of the prosecution's evidence, defense counsel moved for a trial order of dismissal on the grounds that the prosecution had not established a valid degree of intent because Petitioner was intoxicated. Tr. at 807. The trial court denied defense's motion. Tr. at 809.

Nevertheless, during summation the defense persisted in its theory that the prosecution had not proven intent. *See, e.g.,* Tr. at 842 ("if . . . you believe everything that was testified to here by [the victim], you've got to also believe his intoxication, because . . . you can't separate [Petitioner's] intoxication . . . from the rest of [the victim's] testimony."). In response, the prosecution on summation attempted to shore up the victim's credibility and the coherence of her story in the mind of the jury. Referencing the victim's testimony and the range of emotions she displayed on the stand, the prosecution asked, "[W]as that a lie? Or were her answers the sincere product of a woman who had endured the violence of this defendant, who had been repeatedly beat and brutalized? . . . If [the victim] was to frame this defendant she recruited the help of some other people." Tr. at 850. After defense counsel's objection to the prosecution's use of the term of "frame," the prosecution proceeded to reinforce the truth of the victim's story by making light of the notion that the victim could have recruited her friend, her neighbor, and the Buffalo Police Department to collaborate in a plan aimed at getting a wrongful conviction of Petitioner. Tr. at 851. Defense counsel again objected, but the trial court overruled him. *Id.*

The jury's deliberations were labored. Soon after the trial court gave the jury charge and recessed for jury deliberations, the jury sent a note that asked the court – among other things – for a "breakdown of all three charges . . . ." Tr. at 897. After repeating the instructions for all three charges, the trial court dismissed the jurors for the day. Tr. at 917. The following day, the jury asked two questions of the court throughout a full day of deliberation and then, shortly after 4:30

p.m., sent another note that read: "After exhaustive deliberations, we, the jury, have come to an agreement on one charge and we are at a complete deadlock on the other two." Tr. at 931. The trial court indicated to counsel that it would address the note by dismissing the jury for the day, and then reading them an *Allen* charge[2] the following day. Tr. at 931. Defense counsel objected to the *Allen* charge, and made a motion for a mistrial. Tr. at 931–32. The trial court noted the objection, but denied the motion and dismissed the jury for the day without comment to the jury on the substance of their note. Tr. 933–34.

The next morning, the trial court instructed the jury as follows:

Ladies and gentlemen, I have your note indicating that you've been . . . unable to agree on a verdict. As I told you in my initial instructions, any verdict you return on any count, whether guilty or not guilty, must be unanimous. If you cannot reach a unanimous verdict – agreement on a particular count, you cannot reach a verdict on that count and a new trial will have to be scheduled before a different jury.

It is not, however, uncommon for a jury to have difficulty initially in reaching a unanimous verdict, and it is not uncommon for a jury to believe that they will never be able to reach a unanimous verdict. But after further deliberations, most juries are able to reach a unanimous verdict, and so I will ask you to continue your deliberations. But before I do, I want to remind you that when this trial began, many prospective jurors were called and questioned; many were excused for one reason or another, but you, ladies and gentlemen, were selected to serve. That means that all of the prospective jurors called in this case – of – I'm sorry, I have to restate that. That means that of all the prospective jurors called in this case, you were the ones in whom both sides expressed confidence. Both sides were convinced that each of you would be fair and impartial, and that each of you would listen carefully

---

[2] In *Allen v. United States*, 164 U.S. 492, 501 (1896), the Supreme Court found no error in a trial court's instruction, given to a jury that had returned to court for further instruction after some deliberation, that stated, "in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, on the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority." Thus, a trial court's instructions to a deadlocked jury which encourage the jury to continue their deliberations, and "asks jurors to reexamine their own views and the views of others," are often referred to as an "*Allen* charge." *Spears v. Greiner*, 459 F.3d 200, 204 n. 3 (2d Cir. 2006).

to the evidence, to the arguments and to the law, and that each of you would deliberate with your fellow jurors and work hard to reach a unanimous verdict that was consistent with the law and the evidence. Both sides continue to have confidence in you, as I do.

Ladies and gentlemen, you make up a very good jury. There is no reason to believe that the presentation of this case again would be to a jury that is any more intelligent, reasonable, hard working or fair than you are. I want to emphasize that I'm not asking any juror to violate his or her conscience or to abandon his or her best judgment. Any verdict you reach must be the verdict of each juror and not mere acquiescence and conclusions of others, but I'm asking you to continue deliberating and to resume your deliberations with an open mind. Start with a fresh slate. Do not feel bound by how you felt before, whether you favored conviction or acquittal. Have the courage to be flexible. Be willing to change your position if a reevaluation of the evidence convinces you that a change is appropriate. Do not out of pride or stubbornness adhere to an opinion or conclusion that you no longer believe is correct. Be honest with yourselves and with the other jurors. Listen to the other jurors and evaluate what they have to say. Do not let anything prevent you from carefully considering what they say.

Remember that each of you made a commitment when you became a juror that requires you to reason and deliberate together to reach a fair and just verdict based only on the evidence. Of course, while a discussion among all jurors may at times be intense, I am sure you understand that it can and should also be respectful of the feelings and opinions of other jurors. I urge that each of you make every possible effort to arrive at a just verdict here. Make certain that the decision you reach is based solely on the evidence and the law and is not influenced or affected by sympathy for or against any individual, or for or against either side. Be sure that no baseless speculation, no bias or prejudice for or against any individual enters into your deliberations.

If I can help you in any way, whether through a further read-back or through a clarification or restatement of the law, I stand ready to do so. Again, please make every effort consistent with your conscience and the evidence in this case to harmonize your views and decisions in this case with those of the other jurors. To the best of your ability, I ask that you apply common sense and good judgment.

Finally, ladies and gentlemen, I appreciate that the process of deliberations can be difficult. Frankly, it wasn't intended to be easy. So in accord with your oath and your promise to me at the beginning of the trial, please continue to deliberate with a view towards reaching a verdict. Thank you. You could resume your deliberations. We will return to the jury room the items that you previously requested and that we provided to you.

Tr. at 943–46.

After asking two more questions of the court regarding definitions throughout the morning, the jury sent another note to the trial court at around 1 p.m. that stated: "We are unanimous on one charge. We remain deadlocked due to the same issues on the other two charges." Tr. at 967. Defense counsel again moved for a mistrial, and the trial court again denied the motion. Tr. at 970. However, instead of giving the jury another *Allen* charge, the trial court merely instructed the jury "to continue deliberating . . . ." Tr. at 971. Approximately 90 minutes later, the jury returned a unanimous verdict that Petitioner was guilty on all three counts. Tr. at 978. The trial court later sentenced Petitioner to a determinate sentence of 15 years imprisonment on the burglary charge, an indeterminate sentence of two-and-a-third to seven years on the criminal possession of a weapon charge, and an indeterminate sentence of one-and-a-third to four years on the criminal contempt charge. Sentencing Transcript, 11–12, Dec. 2, 2015.

On his counseled direct appeal to the state appellate division, Petitioner argued (1) that he was deprived of his constitutional rights to a fair trial and due process when he was convicted of burglary upon insufficient evidence of the element of intent; (2) that the trial court abused its discretion and coerced the jury into a verdict when it denied Petitioner's motion for a mistrial; (3) that the prosecutor's misconduct during summation deprived Petitioner of his right to a fair trial; and (4) that his sentence was harsh and excessive. Brief for App., i–ii, Sept. 11, 2017. The appellate division concluded, however, that there was legally sufficient evidence from which the jury could have inferred Petitioner's intent on the burglary charge, and it rejected Petitioner's "further contention that the evidence of his intoxication negated the element of intent for the crimes of which he was convicted." *People v. Mercado-Ramos*, 161 A.D.3d 1516, 1516–17 (N.Y. App. Div., May 4, 2018). Additionally, the appellate division rejected Petitioner's argument that the trial court abused its discretion by not declaring a mistrial, found that Petitioner failed to preserve his prosecutorial misconduct argument for review, and found that Petitioner's sentence

was not unduly harsh or severe. *Mercado-Ramos*, 161 A.D.3d at 1517–18. In July 2018, the New York Court of Appeals denied Petitioner leave to appeal the appellate division's decision. *People v. Mercado-Ramos*, 108 N.E.3d 506 (N.Y. 2018).

In October 2019, Petitioner filed the petition for habeas relief that is presently before the Court.

## III. STANDARD OF REVIEW

28 U.S.C. § 2254 provides that ". . . a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." The legal standards applicable to such a petition are well-settled.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas petitions must be filed within one year of the date on which the petitioner's state judgment became final, though the filing of certain state court collateral attacks on a judgment tolls the limitations period. 28 U.S.C. § 2244(d)(1)–(2). A judgment becomes final "after the denial of certiorari [by the U.S. Supreme Court] or the expiration of time for seeking certiorari." *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).

For those petitions that are timely filed, 28 U.S.C. § 2254 requires federal courts to give deference to state courts' decisions. *See Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) (citing AEDPA, Pub. L. No. 104-132, 110 Stat. 1214). "First, the exhaustion requirement ensures that state prisoners present their constitutional claims to the state courts in the first instance." *Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014). *See also Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*) (stating that the "exhaustion requirement is not satisfied unless the [petitioner's] federal claim has been 'fairly presented' to the state courts."). Second, "[s]hould the state court reject a federal claim on procedural grounds, the procedural default

10

doctrine bars further federal review of the claim, subject to certain well-established exceptions." *Id.* (citing *Wainwright v. Sykes*, 433 U.S. 72, 82–84 (1977)). Lastly, federal courts considering claims that were decided by state courts on the merits must employ "a highly deferential standard for evaluating state-court rulings," and must give those state-court decisions "the benefit of the doubt." *Jones v. Murphy*, 694 F.3d 225, 234 (2d Cir. 2012) (quoting *Hardy v. Cross*, 565 U.S. 65, 66 (2011)). In such cases, a federal court may issue a writ of habeas corpus only when the state-court adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law," or that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1)–(2).

A principle is "clearly established federal law" for § 2254 purposes when it is embodied in a Supreme Court holding framed at the appropriate level of generality. *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (quoting, *inter alia*, *Thaler v. Haynes*, 559 U.S. 43, 47 (2010)). A state court decision is "contrary to" such clearly established law when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the Supreme Court on a question of law, or has "decided a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Washington*, 876 F.3d at 403 (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). An "unreasonable application" of such clearly established law occurs when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case such that "the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Washington*, 876 F.3d at 403 (citation omitted). Where a factual determination is at issue, the petitioner has the burden of showing by

clear and convincing evidence that a state court's determination was incorrect. § 2254(e)(1).

## IV. DISCUSSION

Petitioner identifies four grounds for habeas relief. First, he maintains that he was deprived of his Fifth and Fourteenth Amendment rights to a fair trial and due process when he was convicted of burglary on insufficient evidence as to the element of intent. Pet. at 6; Reply, 4–6, Mar. 19, 2020, ECF No. 8. Second, he argues that the state trial court abused its discretion by denying Petitioner's counsel's motion for a mistrial, and coercing the jury into a verdict. Pet. at 7; Reply at 5–7. Third, he argues that he was denied his Fifth and Fourteenth Amendment rights to a fair trial by prosecutorial misconduct during summations. Pet. at 7; Reply at 8–13. Finally, he contends that the state appellate division improperly found that his claims of prosecutorial misconduct were not preserved for review. *Id.*

Respondent, on the other hand, maintains that the determination that Petitioner had the requisite intent was justified by the evidence; that the trial court responded appropriately to the jury notes indicating deadlock; that petitioner was not denied a fair trial by prosecutorial misconduct; and that the state appellate division properly held that petitioner's summation challenges were not preserved. Resp. Mem. of Law, Jan. 24, 2020, ECF No. 5.

After a thorough review of Petitioner's papers and the state court record and transcripts, the Court finds in accordance with Rule 8 of the Rules Governing Section 2254 Cases that an evidentiary hearing is not necessary to address Petitioner's claims. *See also* 28 U.S.C. § 2254(e)(2). Further, the Court agrees with Respondent that Petitioner's habeas application is without merit.

A. The evidence was not insufficient to prove the element of intent.

Petitioner observes that a key element of burglary under New York law "is the defendant's

intent to commit a crime inside a dwelling." Reply at 5. He maintains that the evidence presented at trial demonstrated that his level of intoxication negated the element of intent. *Id.* Specifically, Petitioner points to the victim's testimony that he "ingested 50 Xanax pills and smelled of alcohol . . . . [and] testified that 'he . . . wasn't really making complete sense.'" *Id.* (citing Tr. 644, 677). In addition, he cited Officer Boice's testimony that he "wasn't all there" and was "zoned out" during his arrest. Reply at 6 (citing Tr. 736, 738). Respondent notes that the jury was properly instructed on the defense of intoxication, and maintains that there was sufficient evidence for the jury to reasonably decide that Petitioner was able to form the requisite intent. Resp. Mem. of Law at 12–13.

*i. Legal Principles*

The Supreme Court has held that "the critical inquiry on [the] review of the sufficiency of the evidence . . . [is] whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). That is, "evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (quoting *Jackson*, 443 U.S. at 319). A habeas court "faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Cavazos*, 565 U.S. at 7 (quoting *Jackson*, 443 U.S. at 326). Thus, the petitioner seeking relief on the ground that the evidence was insufficient to sustain a conviction bears a "very heavy burden." *King v. Griffin*, No. 9:17-CV-0321(MAD), 2018 WL 1940419, at *8 (N.D.N.Y. Apr. 23, 2018) (quoting *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000)).

As relevant to this case, the Court notes that under New York law, intoxication is not a complete affirmative defense to a criminal charge. Rather, "intoxication merely reduces the gravity of the offense by negating the specific intent element of the crime charged." *Garfield v. Poole*, 421 F. Supp.2d 608, 612–13 (W.D.N.Y. 2006) (citing *People v. Harris*, 779 N.E.2d 705, 712 n.4 (2002) (discussing N.Y. Penal Law § 15.25)). "Although it is true that a defendant may offer evidence of his intoxication whenever it is relevant to negate an element of the crime charged, . . . even an intoxicated person may be capable of forming the requisite intent." *Garfield*, 421 F. Supp.2d at 613 (citing N.Y. Penal Law § 15.15; *People v. Robinson*, 161 A.D.2d 676 (N.Y. App. Div. 1990); People v. Bell, 111 A.D.2d 926 (N.Y. App. Div. 1985)).

*ii. Application*

Although there was evidence in the present case that Petitioner was under the influence of Xanax, alcohol, or both on December 25 and 26, there was also ample evidence by which a reasonable juror could find that Petitioner had the requisite intent to commit the crimes of which he was convicted. The victim testified that Petitioner had engaged her in text messaging throughout the day, made his way to her home after dark, requested entry, and then conveyed himself through the window when entry was denied. Tr. at 612. She indicated that he was aware enough to recognize her escape attempt, restrain her by the waist, and then spray mace in her face to prevent escape. Tr. at 616. She also stated that he was aware enough to flee when he believed the police were coming. Tr. at 623. The various police officers who interacted with Petitioner noted that he was able to follow instructions, walk without stumbling, get into the police car without assistance, make eye contact and respond appropriately, and comprehend his Miranda rights. Tr. 720 (Officer Boice), Tr. 747–49 (Officer Sheridan), Tr. 791 (Lieutenant Kokotajlo). Accordingly, the Court finds that the record evidence could reasonably support the

14

jury's conclusion that Petitioner had the requisite level of intent for his crimes, and Petitioner's argument regarding insufficient evidence must be dismissed.

B. The trial court did not abuse its discretion in denying Petitioner's motion for mistrial.

Petitioner argues that the trial "[c]ourt's *Allen* charge to the jury, followed hours later by a directive to 'continue deliberating' . . . coerced them into delivering a verdict as a result of undue pressure from the court." Reply at 7. He believes that the trial court's instruction to "continue deliberating" gave "the incorrect and coercive impression that the only just result was a verdict of guilty." Reply at 8 (citing *U.S. v. Haynes*, 729 F.3d 178, 194 (2d Cir. 2013)). Respondent maintains that the trial court's denial of Petitioner's motion for a mistrial and its *Allen* charge and instructions were neither contrary to, nor an unreasonable application of, clearly established federal law. Resp. Mem. of Law at 14–17.

*i. Legal Principles*

Federal law with respect to the trial court's discretion to address a deadlocked jury is well-settled. In *Allen v. United States*, 164 U.S. 492 (1896), "the Supreme Court approved of supplemental instructions given to a deadlocked jury urging them to continue deliberating and for the jurors in the minority to listen to the majority's arguments and ask themselves whether their own views were reasonable under the circumstances." *Spears v. Greiner*, 459 F.3d 200, 204 (2d Cir. 2006). On the other hand, "[a]n *Allen* charge is unconstitutional if it is coercive in the context and circumstances under which it is given." *United States v. Haynes*, 729 F.3d 178, 192 (2d Cir. 2013) (citing *Spears*, 459 F.3d at 205).

The Supreme Court has further explained that:

The decision whether to grant a mistrial is reserved to the "broad discretion" of the trial judge, a point that "has been consistently reiterated in decisions of this Court." *Illinois v. Somerville*, 410 U.S. 458, 462 (1973).

15

\* \* \*

> The reasons for "allowing the trial judge to exercise broad discretion" are "especially compelling" in cases involving a potentially deadlocked jury. [*Arizona v. Washington*, 434 U.S. 497, 509 (1978)]. There, the justification for deference is that "the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." *Id.*, at 510, n. 28. In the absence of such deference, trial judges might otherwise "employ coercive means to break the apparent deadlock," thereby creating a "significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *Id.*, at 510, 509.

*Renico v. Lett*, 559 U.S. 766, 774 (2010).

Under New York law, the state trial court's discretion to declare a mistrial and discharge a deadlocked jury is informed by both statute and caselaw. In particular, New York Criminal Procedure Law ("N.Y.C.P.L.") § 310.60(1)(a) provides that "[a] deliberating jury may be discharged by the court without having rendered a verdict only when . . . [t]he jury has deliberated for an extensive period of time without agreeing upon a verdict with respect to any of the charges submitted and the court is satisfied that any such agreement is unlikely within a reasonable time." Additionally, the New York Court of Appeals has "articulated a number of factors that a trial court should consider before exercising discretion, including 'the length and complexity of the trial, the length of the deliberations, the extent and nature of the communications between the court and the jury, and the potential effects of requiring further deliberation . . . .'" *Rivera v. Firetog*, 900 N.E.2d 952, 956 (N.Y. 2008) (internal citation omitted).

### ii. Application

To begin with, the present case can be distinguished from the case cited by Petitioner in support of his claim – *United States v. Haynes*, 729 F.3d 178 (2d Cir. 2013) – in terms of both the context in which the *Allen* charge was delivered, and the actual substance of the charge. With respect to the context of the charge, whereas the improper charge in *Haynes* was delivered

to the jury late on a Friday afternoon, and after the trial court had already delivered one modified *Allen* charge four hours earlier, the charge in the present case was delivered at the beginning of the second full day of deliberations, and was the first such charge delivered. *Compare Haynes*, 729 F.3d at 192–94; Tr. at 943. The court's second comment in the present case, which simply directed the jurors to continue deliberating, was delivered in the early afternoon and a verdict was not delivered for another 90 minutes. Tr. at 971. In addition, the improper *Haynes* charge was delivered in response to questions from the jury unrelated to their deadlock: i.e., reasonable doubt and the absence of evidence. *Haynes*, 729 F.3d at 193–94. Here, however, both the trial court's *Allen* charge and its directive to the jury to "continue deliberating," were responses to notes from the jury indicating that it was deadlocked. Tr. at 931, 967. Lastly, there were other indicia of unfairness in *Haynes* that were not present in this case: specifically, the *Haynes* defendant was tried in shackles despite the absence of a finding of necessity on the record. *Haynes*, 729 F.3d at 190–91.

Equally as important, the substance of the two charges was also considerably different. In *Haynes*, the charge that the Second Circuit found to be coercive "encouraged the jurors to exchange views with one another, consider each other's views, and work diligently to reach a verdict, but did not contain the admonition not to give up conscientiously held beliefs." *Haynes*, 729 F.3d at 194. Moreover, it "did not suggest that failing to reach a unanimous verdict was permissible." *Haynes*, 729 F.3d at 194. By contrast, in the present case, the trial court began its charge by acknowledging that if the jury "cannot reach a unanimous verdict – agreement on a particular count . . . a new trial will have to be scheduled before a different jury." Tr. at 944. The trial court proceeded to indicate that it was "not uncommon for a jury to have difficulty initially . . . . . [b]ut after further deliberations, most juries are able to reach a unanimous verdict . . . ." *Id.* In

making this statement, the trial court "emphasize[d] that [it was] not asking any juror to violate his or her best judgment," but simply to "make every effort consistent with your conscience and the evidence in the case to harmonize your views and decisions . . . with those of the other jurors." Tr. 945–46.

Finally, the trial court's exchanges with counsel prior to issuing the *Allen* charge demonstrate that the court had made the appropriate considerations under New York law. Before addressing the jury, the trial court indicated its agreement with the prosecution that N.Y.C.P.L. § 310.70(b) required the court to refuse a partial verdict and order the jury to resume its deliberation. Tr. at 940–41. Then, in considering defense counsel's objection to the *Allen* charge and motion for a mistrial, the trial court observed that the jury had only deliberated for a "very brief period of time" on the first day of deliberations, and deliberated for most of the day on the second day. Tr. at 941. Therefore, the trial court concluded that "they really were only deliberating for several hours on three very, what I consider to be, somewhat complicated charges." Tr. at 941.

The trial court made a record of similar considerations prior to directing the jury to "continue deliberating." Having received a second note concerning the jury's "deadlock," the court indicated that "my concern is that they had a series of questions that they asked via jury notes . . . following the *Allen* charge, and the question that they asked that the Court responded to was new . . . It's not been that long of a period of time since . . . the last charge . . . it's only been an hour and a half." Tr. at 968–69. After denying defense counsel's second motion for a mistrial on this basis, the trial court then offered defense counsel a choice as to whether he would prefer the court reread the *Allen* charge, or simply instruct the jury to continue deliberating. Defense counsel expressed the preference that the court instruct the jury to continue

deliberating. Tr. at 970–71.

Because the trial court's *Allen* charge was not coercive based on the circumstances and context of the charge, was substantively correct, and considered the appropriate factors under New York law, the Court finds that Petitioner's challenge to the *Allen* charge is without merit. Similarly, the Court disagrees with Petitioner's characterization of the trial court's direction to the jury to "continue deliberating" as coercive. Petitioner's claims in this regard must be dismissed.

C. Petitioner was not denied his right to a fair trial by prosecutorial misconduct.

The Court will address the third and fourth grounds for relief that Petitioner raises in his habeas application in a single discussion.

Petitioner maintains that he was denied his constitutional right to a fair trial based on prosecutorial misconduct on summation, and that the state appellate division incorrectly ruled that Petitioner failed to preserve this issue for review. He states that "[t]he prosecutorial misconduct occurred when [the prosecution] referred to the defense's case as a 'conspiracy' . . . or a 'frame-up' . . . . [and] when they stated [the victim] got the Buffalo Police Department in on the act." Reply at 9 (citing Trial Tr. at 849, 851). "Confronted with such arguments," Petitioner argues, "jurors could be expected to feel that in order to find [Petitioner] innocent, they would have to abandon confidence in the integrity of the government." Reply at 9 (quoting *U.S. v. Goff*, 847 F.2d 149, 163 (5th Cir. 1988)). He contends that the appellate division erred because the court cannot have cured the prejudicial effect of the misconduct "because the misconduct continued after each objection or protest." Reply at 13. Respondent counterargues that the appellate division did not err, and that in any event Petitioner was not denied his right to a fair trial by prosecutorial misconduct. Resp. Mem. of Law at 16–21.

*i. Legal Principles*

To succeed on a claim of prosecutorial misconduct in a habeas proceeding, the petition must show that the prosecutor engaged in "egregious misconduct . . . amount[ing] to a denial of constitutional due process." *Walker v. Bennett*, 262 F. Supp.2d 25, 34 (W.D.N.Y. 2003) (quoting *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990); *Donnelly v. DeChristoforo*, 416 U.S. 637, 647–48 (1974)) (internal quotation marks omitted). A prosecutor's conduct constitutes a denial of due process if it causes "substantial prejudice by . . . infecting the trial with unfairness . . . ." *Bellamy v. City of New York*, 914 F.3d 727, 762 (2d Cir. 2019). The Second Circuit has articulated a three-part test to assess "whether prosecutorial misconduct caused 'substantial prejudice' . . . which considers the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *Bellamy*, 914 F.3d at 762 (quoting *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 95 (2d Cir. 2014)).

*ii. Application*

At the outset, the Court finds that the procedural default doctrine precludes the Court from reaching the merits of Petitioner's arguments. The appellate division found that counsel's failure to request a curative instruction after his objections to the prosecution's summation were sustained dictated the conclusion that "the court is thus deemed to have corrected any error to defendant's satisfaction." *Mercado-Ramos*, 161 A.D.3d at 1517 (citing *People v. Ennis*, 107 A.D.3d 1617, 1620 (N.Y. App. Div. 2013)). Under New York law, it is a "firmly established and regularly followed" legal principle that where counsel fails to object further or request a mistrial following a trial judge's ruling on an objection during summation, the court's ruling or curative instructions "must be deemed to have corrected the error to the defendant's satisfaction." *People v. Heide*, 644 N.E.2d 1370, 1372 (1994) (citing *People v. Williams*, 390 N.E.2d 299 (N.Y. 1979)).

Here, the state appellate division found that Petitioner had not preserved his issues with the prosecution's summation for review because he did not object further following the trial court's rulings on his respective objections. Consequently, the procedural default doctrine precludes the Court from considering Petitioner's arguments in this proceeding. *See, e.g., Gonzalez v. Miller,* 1 F. App'x 71, 74 (2d Cir. 2001) (finding that a petitioner's failure to "object to the court's curative instructions or move for a mistrial on the ground that the curative instructions were inadequate" was a "fair or substantial basis in state law" for finding procedural default).

Moreover, even if the Court were not precluded from considering Petitioner's argument of prosecutorial misconduct, the Court agrees with the appellate division that "the comments by the prosecutor were not so egregious as to deny defendant a fair trial . . . and any potential prejudice to defendant was alleviated by the court's rulings and instructions." *Mercado-Ramos*, 161 A.D.3d at 1517–18. For one, to the extent that the prosecutor's remarks suggesting that the theory of the defense was that Petitioner was framed were improper, the severity was low; "taken in the context of the trial as a whole, any misconduct constituted an 'aberration in an otherwise fair proceeding,' thereby mitigating its severity and foreclosing 'substantial prejudice.'" *United States v. Eberhardt*, 793 F. App'x 8, 12 (2d Cir. 2019). Additionally, any prejudice Petitioner may have suffered from the remarks were mitigated by the trial court's instructions both before and after summations. *Id.* Before summation, the court instructed jurors to bear in mind during summations that they, the jury, are the finders of facts and "whatever the lawyers say and however they say it you should remember that what the lawyers say is simply argument . . . . nothing a lawyers says at any time is evidence, so nothing the lawyers say in the summations is evidence." Tr. at 825. After summations, the trial court again reminded the jury that "the

summations of counsel are, of course, not evidence." Tr. 871. Lastly, as recounted above the evidence against Petitioner in the case was overwhelming, and thus it is highly probable that the jury would have found Petitioner guilty even absent any misconduct.

Accordingly, the Court finds that Petitioner's claims of a denial of his right to a fair trial, prosecutorial misconduct, and error by the appellate division are without merit and must be dismissed.

CONCLUSION

Based on the foregoing, it is hereby ORDERED that Petitioner Edgardo Mercado-Ramos's application for habeas relief [ECF No. 1] is denied. Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Petitioner has not made a substantial showing of the denial of a constitutional right. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Any requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

The Clerk of the Court is hereby ordered to fix the caption on the docket by changing Petitioner's name on the caption from "Edgurdo" to "Edgardo," and then to close this case.

SO ORDERED.

Dated:      July 31, 2023
            Rochester, New York

ENTER:

*Charles J. Siragusa*
CHARLES J. SIRAGUSA
United States District Judge